AUGUST F. BARTELS et al., Appellees, v. WOODBURY COUNTY et al, Appellants.

**EASEMENTS:** Obstruction—Highway Bridges—Injunction.  Evi-
1  dence reviewed, in an action to enjoin the county, in constructing

a concrete culvert, from destroying plaintiff's conceded easement in a runway for stock, and *held* to show (a) that a runway in the bed of a creek was not a practical runway for stock and (b) that the tearing out and filling in of the old bridge should be enjoined, unless the county furnished plaintiff an independent runway.

BRIDGES:   Construction—Resolution of Necessity—Hearing—Effect.
2   The notice of the hearing on the so-called "resolution of neces- sity" provided by Sec. 1527-s12, Code Sup., 1913, as preliminary to the final order for the construction of certain bridges, is not notice that the board of supervisors may deprive a property owner of easements or property rights. The proceedings before the board do not contemplate the settlement of property rights.
Note: Sec. 1527-s12 is now repealed. See S. S., 1915, page 123.

*Appeal from Woodbury District Court.*—DAVID MOULD, Judge.

SATURDAY, FEBRUARY 12, 1916.

This is an action in equity to enjoin the county and its officers from completing the construction of a concrete cul- vert and from filling in the space under a former trestle bridge at the sides of the culvert and impeding or obstruct- ing the water of a small stream flowing through plaintiff's premises, and from destroying or removing an existing bridge so as to interfere with or destroy plaintiff's runway for stock from his land on either side of the highway, and from main- taining the highway without providing and maintaining an ordinary and satisfactory runway for plaintiff's stock. There was a decree for plaintiffs, and defendants appeal.—*Affirmed.*

*Naglestad, Kindig & Mullan* and *C. N. Jepson,* for appel- lants.

*E. J. Stason,* for appellees.

PRESTON, J.—About the year 1902, one Simpson owned 160 acres of land. A road was established, running north and south, which divided his farm into two parts, leaving 80 acres on either side of the new highway. Simpson appealed to the district court from the amount of damages allowed him by the appraisers and the board of supervisors, the

appraisers having allowed him $600, and the board of super-
visors, upon a hearing, having reduced it to $300. The con-
troversy was settled by paying Simpson $550, and it was
agreed by the board of supervisors that the bridge to be con-
structed by the county in the highway dividing Simpson's
land should be built 9 feet high from the top of the north
creek bank to the bottom of the stringers. Later, Simpson,
upon payment to him by the supervisor of that district of the
sum of $25 additional, agreed that the bridge could be low-
ered a foot and the passageway scooped out at the bottom.
When the board of supervisors reduced Simpson's damages
to $300, it ordered:

"The road is established, provided petitioners pay the
$300.00 damages within 30 days, and also with the further
proviso that the county construct an ordinary runway for
stock under the bridge across the creek when such bridge
is built."

When the parties interested added $250 to this assess-
ment, the board made this record:

"In consideration of additional damages paid by parties
interested, J. S. Simpson agrees to dismiss his appeal, pro-
vided the county will build a satisfactory cattleway under the
bridge; wherefore on motion this resolution was adopted, as
follows, to wit:

" 'Be it resolved and ordered by the board of supervisors
that the bridge to be built on the road heretofore established
through the Simpson land in Banner Township, be and is
hereby ordered to be so built that said bridge shall be nine
feet high from top of north creek bank to the bottom of the
stringers.' "

It is conceded by appellants that appellees have suc-
ceeded to whatever rights Mr. Simpson had in the premises.
The bridge which was constructed at that time was a pile
bridge, with two end bents and one in the middle. At the
time the old bridge was built, in order to make it 9 feet high,

it was necessary to construct an embankment to the north of the bridge. The bridge, at the present time, is in a highway that is a part of the county road system under the so-called new road law. The county, under this new road law, passed a resolution of necessity, providing for the construction of a concrete bridge, or culvert, to take the place of the old bridge in question, the same to be 7 feet wide and 9 feet high. The board caused said resolution to be published, as required by law. The resolution of necessity recited that the new culvert was to provide a waterway for a drainage area of 1,000 acres. It appears, however, from the evidence that the drainage area of the stream was in fact about 3,000 acres, instead of 1,000.

The first bridge was a wooden one, about 36- feet in length, and was constructed in accordance with the provisions of the settlement, and Simpson and his immediate and remote grantees, including the plaintiffs, were provided with and used the space under the bridge for stock, in passing from one 80 to the other, without interference on the part of the defendants, for a period of 12 years prior to the commencement of this action. The runway provided was on the bank, was 9 feet high, and was about 16 feet wide. After the resolution of necessity for the new culvert, the defendants proceeded to construct, and did construct, the concrete culvert of the size above mentioned, and were about to tear down the old bridge and to fill up the space used by the plaintiffs for a runway, with a solid embankment of earth on each side of the culvert, when this action was commenced.

As stated, the trial court found for plaintiffs. The decree, among other things, provides that plaintiffs are the owners of the land described and "of a perpetual easement of adequate runway for stock under the bridge as at present constructed, so that stock can pass back and forth from one of the said tracts to the other; that the defendants were at the time the temporary injunction in this action was sued out engaged in the construction, under the said bridge, of a

concrete culvert, for the stream flowing thereunder, with an opening 7 feet wide and 9 feet high, and without making any adequate provision for a runway for the plaintiffs' said stock, and that the defendants were, and are, preparing, and intending, to tear down the said present bridge, and to fill in a solid earth embankment or grade on both sides and over the proposed culvert, and that in doing so it will destroy the plaintiffs' runway for stock and interfere with and destroy their said easements; that the said culvert will not afford, as claimed by the defendants, an adequate runway for plaintiffs' stock, but that a runway, constructed 7 feet wide and 9 feet high, independent of the concrete waterway, would be an adequate runway under the terms of the grant of the said easement, and that under the terms of the said grant the defendant, Woodbury County, is required to build or construct the said runway at its own cost; that the defendants be, and they are hereby, perpetually enjoined and restrained from destroying, removing or maintaining the bridge now across the said stream, so as in any manner to interfere with, obstruct or destroy the plaintiffs' easement of runway for stock under the bridge and highway, or from building or maintaining the roadway embankment adjacent to the said concrete culvert so as to interfere with, obstruct or destroy the plaintiffs' said easement or interfering with the enjoyment of the same by the plaintiffs and their grantees in substantially the same place under the said highway, where it has been maintained for a number of years. It is however provided that the defendants may construct for the plaintiffs, at the defendants' costs, at or near the place, under the present bridge, where the plaintiffs' easement of runway has been maintained for several years, a runway for the plaintiff's stock, and that of their grantees, independent of the said waterway culvert, not less than 7 feet in width and not less than 9 feet in height, and that a runway so constructed and maintained shall not be considered an interference with or an obstruction of the

said easement, or an interference with or obstruction of the enjoyment thereof.''

The propositions relied upon by appellants for a reversal are:

''1.   That the license or easement acquired by the appellees was not in a fixed, certain and definite place, and, therefore, the same has not been interfered with in any way.

''2.   That even if, as claimed by the appellees, they acquired an easement in a runway for the passage of stock to the north end of the bridge, the same was destroyed by the encroachment of the stream upon it and eroding it entirely away, and, consequently, the stock of the appellees and the owners of the land preceding them passed to the south of the piling in the center of the bridge.

''3.   That the concrete bridge as constructed does not interfere with, impair or obstruct in any way or manner the easement that appellees have to permit their stock to pass and repass under the new bridge, but, on the contrary, the evidence shows that it is simple and sufficient as a passageway for stock.

''4.   That the concrete bridge as constructed will be ample to take care of the usual and ordinary flow of water discharging itself along said stream.

''5.   That the appellees are estopped from making any objection thereto by reason of failing to make objection to the construction of said bridge until its completion.

''6.   That, said concrete bridge being constructed in a highway that is a part of the county road system, and the board of supervisors having passed a resolution of necessity and causing notice thereof to be published, and fixing the time for hearing thereon, and the appellees not appearing or making objection, they are now too late to question the action of the board of supervisors in relation thereto, and the construction of this concrete bridge.''

1.   As to the first proposition, no authority is cited, and

there is but little, if any, argument by appellants on the point.

It is contended by appellees:

"That there was a valid binding contract entered into by and between J. S. Simpson and Woodbury County, giving the former the right to 'an ordinary runway for stock under the bridge', and for the purpose of enabling his stock to pass from one 80 to the other. That the settlement of the litigation and the dismissal of the appeal was sufficient consideration to support the contract, evidenced by the resolutions passed by the board of supervisors. That both parties considered that they had entered into a binding contract, and a permanent arrangement is evidenced by the fact that Simpson was subsequently asked permission by one of the supervisors to lower the bridge one foot, and by the fact that, for more than 12 years, what was at the time apparently assumed to be a permanent arrangement was observed." They say that "a passageway for stock under a highway or a railway track is an easement, and appurtenant to the real estate." They cite *Ague v. Seitsinger,* 85 Iowa 305; *Agne v. Slitsinger,* 96 Iowa 181; *Hubenthal v. Spokane, etc., R. Co.,* 43 Wash. 677 (86 Pac. 955). They contend further that, "if the right is appurtenant to real estate, a deed to the land is sufficient to convey the easement. The easement, therefore, passed from Simpson to the plaintiffs, as an incident to the conveyance of the farm. *Cassens v. Meyer,* 154 Iowa 187, 191; *Moll v. McCauley,* 83 Iowa 677; *Reed v. Gasser,* 130 Iowa 87; *Kane v. Templin,* 158 Iowa 24." And they say:

"It may be contended that, since the old bridge was being replaced with a new one of a different construction, the easement which had been granted for a *runway under a bridge* was terminated. But this point was determined against such contention in the case of *Ague v. Seitsinger,* 85 Iowa 305, above cited, which case was four times before this court (85 Iowa 305; 96 Iowa 181; 60 N. W. 483; 104 Iowa 482). The

controversy in that case was similar in many respects to the controversy in this case."

We deem it unnecessary to pursue this subject further, because it is conceded in argument by appellants that it was the purpose of Woodbury County, in building the new concrete bridge complained of, to afford the appellees a runway for their stock. The only question in this case, it seems to us, is whether or not the concrete bridge as constructed will afford the appellees a usual, ordinary and practical runway for their stock. If it does, then Woodbury County should not have been enjoined. They contend that the record in this case shows, by a clear preponderance of the testimony, that the new concrete bridge, as constructed, will afford an ample runway for appellees' stock, and the same is not an obstruction or an impairment of or an interference in any way with the right of the appellees to have a passageway to and fro across the road at this point for their stock.

2. As to the fifth proposition, in regard to an alleged estoppel, no authorities are cited, and we find no argument, except that appellants say:

"Bartels is clever, if nothing else. Knowing of the proposed construction of the new concrete bridge, he waited until it was done and the county was about ready to proceed to fill up to the new bridge before he commenced his action to enjoin the county, thinking, no doubt, that thereby the county would be compelled to build him a new and independent runway for the passage of his stock; that, because of the publication of notice under the new road law, referred to in a later division of the opinion, appellees had an opportunity to come in and object to the proposed improvement and state their reasons therefor, thus giving the county a chance to meet then the objections urged, instead of going to the large expense that it did in erecting this improvement and then afterwards having the appellees make objections."

The record does not show that appellees made objection

before the board, but the record does show that they objected to the size of the culvert when the same was being constructed and prior thereto, and they were assured by a member of the board who was supervising the work that the culvert would be sufficient.

The complaint of appellants, as we understand it, seems to be that plaintiffs should not have waited until the new culvert was partly completed before commencing their action. But in another part of their argument, they seem to complain because plaintiffs did not wait longer; for they say:

"It appears to us that, after waiting as long as they did, and permitting Woodbury County to put in this permanent improvement, at a large expense, the appellees might well have waited a little bit longer, and then have been able to demonstrate to a certainty the impracticability of the new structure as a runway for their stock, if it is impractical. It would not then have depended upon conjecture or speculation; and if it had developed that the new bridge, as constructed, was impractical and would not afford a reasonable passageway for appellees' stock, every right that they had could have been amply protected in the same kind of a suit as the one which they brought."

We held, in *Thomas v. City of Grinnell*, 171 Iowa 571, that, where plaintiff fails to show with any reasonable certainty that the drainage from the city which is merely an incident to the construction of a sewer system constructed for an altogether different purpose, will increase the flow of the creek in a manner to materially injure the lower riparian proprietors, an injunction will not lie; that it must clearly appear, not only that the defendants are about to do the act alleged in the petition, but also that such act will be attended with the apprehended injurious consequences. Of course, if the evidence did clearly show that such consequences would follow, an injunction would lie.

We are of opinion that, in the instant case, the testimony is sufficient to establish plaintiffs' claim and justify an injunc-

tion.  But, under the concession of counsel for appellants in argument, before set out, that the only question in the case is as to the sufficiency of the new concrete culvert, we may dismiss the subject of estoppel and proceed to determine the principal point argued by appellants. This is a question of fact.

1. EASEMENTS: obstruction: highway bridges: injunction.

3.  Witnesses testifying for defendants gave it as their opinion that the new culvert was sufficient for the purpose intended.  On the other hand, witnesses for plaintiffs gave it as their opinion that it was not sufficient, and some of them give their reasons therefor.  Appellants contend that plaintiffs' objections to the new culvert are imaginary.  We shall not attempt to set out all the evidence.

One witness testified that he had handled stock considerably; that he had had no experience with runways excepting this one; that a barn door for horses should be about 8 feet; for cattle, it would have to be about 10; that cattle crowd more and jump on one another more than horses do, and are liable to injury in that respect.

"In answering the question as to the reasonable width of a runway, I would refer to the alleys they have in our stock yards.  I have had a good deal of experience in handling stock for shipping, and that is the only experience I have had with runways outside of this one.  The width of those are from 12 to 16 feet.  I do not consider it practical to have a runway for stock which is used also as a water way in the stream.  I do not think that this water way under the bridge is practical, because the creek bed there is of a soft nature, and the horses especially would wade up and down that creek in order to get into the runway, and the liability of washing is greater than if it was a sand or gravelly bottom. It would be all right in winter time if you could shoe the horses and cattle.  Stock would not pass through a runway of that character on frozen ice, unless forced to.  The width of this stream above and below the bridge from bank to bank runs.

on an average of about 28 to 30 feet. The bed of the creek is a muddy bottom. The effect of cattle tramping through it would cause their legs to get rough and sore, and as to the milch cows it would have an injurious effect on their bags. After a quite heavy rain the creek runs out of its banks; in an ordinary rain it is up even with its banks. The creek has never gone dry to my knowledge."

Another says:

"I do not think the culvert sufficient to carry the water that ordinarily goes down the creek. The creek carries debris which I have noticed more or less along the banks in the grass. The tendency of a culvert 7 feet wide would be to catch the debris that would ordinarily flow down the stream in high water, and it would catch on the sides and block the culvert. The old bridge was 35 feet in the clear where now it is only 7.

"I have had no experience with runways, but have had with cattle in passing through gates or doors. A runway should be from 8 to 10 feet high and from 10 to 16 feet across. I base this upon finding that upon our farm the stock passing through from one yard to another gates should be 14 feet wide. If they are smaller they jump on them. Cattle going into a door will ride or jump each other more or less; horses are apt to strike their hips or wethers when running. It is not practical to have a runway for stock in a creek bed which is also used for a waterway for the creek. You could not get hogs, pigs, sheep and lambs to go through while the water was continuously going through. In the winter time it would be icy."

Another witness says:

"I have seen the concrete culverts out there. I do not think it would carry the water in the creek during high water. The stream carries more or less debris—fences, wire and posts and planks. I think this debris would have a greater tendency to clog the new culvert than the old bridge. I should say that the new runway would not be as good as an ordinary gate because it is too narrow. I

have had experience with horses, sheep and cattle crossing ice. If ice is smooth, it is pretty hard to get them over. Under the culvert it is liable to be smooth; if snow and ice forms under the culvert it would be pretty hard to get them through at all.''

Another witness says that a fair and reasonable width for a runway for stock would be from 15 to 16 feet.

The plaintiff, August Bartels, testified:

''I use the farm for raising grain and stock. I have ordinarily on hand from 50 to 75 head; sometimes I have 100. Large cattle and small ones. I raise sheep and hogs—from 100 to 150 a year. I have on an average 12 head of horses; I have had as high as 18 or 19 head with the colts. The old bridge is about 30 feet long; it was 9 feet from the bridge to the bottom of the underway crossing. The cattle way was 16 feet from the center piling from the north end of the bridge, and the fences that run from the road line are attached to the fence from the wing of the piling. I learned that the old bridge was to be displaced by a new one about the last of April. No work had been done at that time. Geo. Miller told me they were going to build a concrete culvert. I was sick at the time. I went to Lawton one day and met Mr. Anderson, a member of the board. I asked him whether he was going to put in a new bridge and he said yes. I asked him what size it was going to be, and he said 9 feet wide and 7 feet high. He said they were not going to put in a bridge—just a culvert. I said that that would not carry the water. He said that it would carry the water; that the engineer had figured it and he ought to know. I asked Mr. Anderson how many acres of drainage there were up there and he said that the engineer had figured it up from one thousand to twelve hundred acres. I said, 'I will be damaged.' He said 'Then sue the county for your damages.' I said 'why not have it fixed right before we had any trouble about it?' He said that he thought it would be all right to carry the water coming through. I told him I also had a cattle runway through there.

He said 'I don't know whether you have or not.' I said, 'You go to Sioux City to the court house and see'. He said he was going to Sioux City and look and see if I had the runway there under the bridge, and if I had, he would see me again. No work had been done at that time. I did not see him again until they started work on the bridge. I went down and they had the bottom concrete in. I said that 7 by 9 would be entirely too small. I called Mr. Anderson up the next day, and he said that he would be along there, and when he came I went down and talked with him about the bridge. He said I hadn't any right to the fence up against the bridge; that it shut off the public way. I told him the fence had been there since I bought the place. He said that the supervisors would likely shut me off altogether under there; that I would have no underway through there at all. I said I didn't think they could do that and pulled out a copy of the paper here and showed it to him and he read it over and said that he hadn't found anything quite like that. He said he would go in again and see. We talked the matter over down in the auditor's office and examined the records. He then said with reference to providing me a runway that I could cross in as narrow a culvert as this was, but he did not say that I could keep that always. This talk was about the 14th or 15th of June. This suit was commenced after that. The runway is mostly on the north side of the creek and the culvert was put in on the south side at the end of the bridge. From my observation as to the quantity of water going down stream there I would say that the new concrete culvert will not be able to carry the water. The concrete bridge is so narrow that these timbers and trash that come down will gorge against it and not let it pass through. I have seen ice go through in the spring. The ice would not pass through this small culvert. This creek drains about 3,000 acres; it has three branches above. I have never seen this stream dry. I have had experience with stock runways in Nebraska. I have had experience handling

stock in barns and sheds.  A runway should be 9 by 10 or 9 by 12 feet; if it is narrower they will hurt each other and get bruised.  Cattle will cramp their young unless you give them plenty of room.  I have never had experience with runways where cattle were forced to go through water in order to get through.  The concrete culvert that is now constructed under the old bridge through which the water must flow is not a practicable runway for stock.  Ice in the winter time would accumulate there.  It would be dark in there when the cattle were in there. I have seen ice in that creek freeze three or four feet thick.  I have not had any trouble with the old runway excepting last year when the planks furnished by Mr. Simpson were pulled out and it dug in and the cattle would not go through good.''

We have read the entire record, and are satisfied with the finding of the trial court that the new runway in question is not sufficient.

4.  It is conceded that the culvert in question was constructed under the provisions of Chapter 122, Acts of the Thirty-fifth General Assembly, Section 13 of which provides, in substance, for the adoption of a resolution of necessity, which shall be published in one issue of each of the official papers of the county.  A time and place of hearing protests are to be fixed by the board, and it is provided that, upon the termination of said hearing, the board shall adopt a resolution stating its final determination to construct the bridge or to abandon the construction of the same It is further provided that the decision of the board shall be final, and no appeal shall be allowed therefrom.

2. BRIDGES: construction: resolution of necessity: hearing: effect.

In view of the determination of the one proposition relied upon by appellants, as stated in the last paragraph of the opinion, it is perhaps unnecessary to discuss at any length this proposition or to determine the point.  But it is said by appellants that they do not know the intention of the legislature

by these provisions, but that apparently it had in mind that, in the standardizing and improving of the highways of this state, if anyone interested had any objection to the proposed improvement, a tribunal had been provided at which a hearing could be had thereon. Counsel for appellants further say that the act just referred to provides that no appeal shall be taken, and that it may be claimed that such a provision is unconstitutional, especially if its purport was to take away any vested right that anyone had.

It is contended by appellees that such a statute, authorizing and requiring certain proceedings preliminary to the construction of the concrete bridge on a highway, authorizes the taking of private property without compensation; that the authority to take such property for works of public improvement is given only by the chapter relating to eminent domain; and that the procedure adopted by that chapter was not complied with in the instant case. But in our opinion, the plaintiffs had no notice that defendants were proposing to deprive them of their easement of runway which the county had granted to Mr. Simpson, years ago. The construction of a waterway culvert is not inconsistent with the maintenance, on the part of the county, of a stock runway, independent of the concrete waterway. We think plaintiffs had the right to assume, at the time the proceedings were pending before the board, that the county would respect the contract which it had entered into in 1902 with Mr. Simpson. From a reading of the act in question, we are of opinion that it was not the intention of the legislature that thereby property rights should be settled.

Our conclusion is that the decree of the district court was right, and it is, therefore,—*Affirmed.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.